May it please the court, my name is Brandon Brown and I along with my co-counsel represent Larry and Cheryl Zubrod, who are the parents of Michael Zubrod. They lost their only son on September 22, 2013 and as administrators they brought an application against deputies from the Worth County Sheriff's Department. I intend to focus my argument today on whether the district court erred in granting summary judgment by concluding that Deputy Hoch did not utilize excessive force when tasering Michael in violation of clearly established law. Some relevant facts, bare brief discussion. As I indicated, this event occurred on September 22nd, 2013 in a small town, Northwood, Iowa, just south of the Minnesota border. Three officers responded. The first officer who was on scene, Deputy Short. The record shows he had very little law enforcement experience. He had just completed field training and had not yet attended the Iowa Law Enforcement Academy. He was dispatched to a domestic disturbance call at the Shook Eye residence. And upon entering, he saw what we would concede admittedly is a very disturbing scene. It was very alarming. Michael was accosting Rhonda Shook Eye with a hammer and pliers, an attempt to seriously injure her. Now Deputy Short did attempt to subdue Michael with the use of a taser. That was unsuccessful, so he elected to go hands on with Michael, which we assert was successful in at least eliminating Michael from posing a risk to Ms. Shook Eye or anybody else in the residence at that time. I know there was some dispute over the semantical use of the word control, but I think it's safe to say that Deputy Short was successful in neutralizing Michael for approximately eight to ten minutes before another deputy, Deputy Hoke, arrived on scene. And at that point, if you look at the evidence in a light most favorable to us, there is testimony that after Deputy Hoke arrived, Deputy Short voluntarily got off of Michael with the expectation that they would be able to handcuff him at that point. They were incorrect. Michael quickly got to his feet, took an aggressive stance against the two officers who attempted to take him into custody and handcuff him. Deputy Hoke attempted, I believe at that time, to use a taser. That was unsuccessful, but fortunately, a few minutes later, the third deputy arrived, Deputy Smith. He, too, was armed with an X26 taser and attempted to deploy it against Michael, but it malfunctioned. So all three officers elected to go hands-on with Michael. And at this point is when you can see the video footage from Deputy Hoke's taser camera. We're now in a separate room from where Ms. Shukai was located. Michael is situated on the ground, he's lying face up, and he's looking at Deputy Hoke's taser. You can see his eyes, his face very distinctly in the opening segments or sequence of the taser footage. We would assert, contrary to what the district court found, there's a clear demarcation between the first encounter with Michael, where he was upright, he was actively aggressive, he was fighting with officers. When he was on the ground several minutes later, admittedly disoriented, fatigued, and really unable to continue fighting in the same manner that he had earlier. And the district court characterized the situation from beginning to end, including the depictions on the video taser camera footage as tense and rapidly evolving and uncertain, and as a result, was a continuous and fluid encounter. We would disagree with that. There are three cases that we rely upon, one of which is instructive from the Sixth Circuit Court of Appeals. It's the Landis case that we cited in our brief, would also rely on an Eighth Circuit brief, or excuse me, opinion that was issued well in advance of the encounter that officers had with Mr. Zubrod. That's the Crout decision, and there's also a district court decision out of Missouri that's instructive on the issue. And what we respectfully submit to the court, where the trial court erred, is it failed to give Michael and his parents all reasonable inferences. One thing that we noted in the opinion is the court claimed that it was unable to determine the loud noises, whether they were attributed to pain or anger. I think they said it was unanswerable. And if you watch the video, to us, giving us all fair inferences, it's very clear that a lot of the noises that come from Michael are right at the time when he's being tased. So we believe we should get an inference on how he was acting at the time that the video depicts the interaction. Another issue that we have with the district court's opinion is that it claims that it was too difficult to tell the number of times the taser was discharged. Now, as it's evident from the video, it makes a clicking sound when it's been activated and it's going through a five second cycle. And there are at least ten or so times on the video where you can hear this clicking sound. Do we know how many of those were actually successful or actually made contact to discharge into the recipient of the charge? The defendants tried to dispute that each and every deployment was successful because they claimed that Michael was pushing the taser off of him while it was being deployed. However, for summary judgment purposes, I believe the court correctly concluded that it should infer that all of them successfully discharged and cycled while being deployed on Michael. So we would ask the court to do the same, especially when looking at the evidence in the light most favorable to the non-moving party. And also, basing it upon the reaction from Michael while he was on the ground certainly reveals that he was experiencing pain. And any argument that we may have that Michael was actively resisting on the ground, I would ask the court to review the video, and it appears as though if there is any response physically that manifests from Michael, it's at the time when Officer Hoke is actually deploying the taser. So it seems to me that the defense is to the taser that he's actively resisting, he's fighting. But that's a product of the taser being used on a subject. And when you have a subject which is like Michael who was- Are you talking about when he's standing up on the ground, or standing up- No, I'm talking about the uses that you are objecting to. You say, well, the only resistance was his response to the taser. So I'm wondering, are you saying that the initial use of the taser on the ground was unjustified because he was already submitting? Well, the way that I look at the first deployment of the taser, if that was in isolation, perhaps it could be justified. But that happens nine seconds into the video. All right, so if that one's justified, then what did they do wrong? What, they shouldn't have used it the second time? I said if in isolation, perhaps that would be justified. I don't know what you mean by in isolation. I mean, I'm talking about at the moment it was deployed, was it reasonable because he was still fighting them, even though he was down? I can understand where an argument would be made to support that, Your Honor. But if you look at the facts of this case, Defendant Hoke had admitted at that point that it's possible he looked disoriented. He certainly didn't go so far as to say yes, I would agree with you in his deposition that he was disoriented. But he said I could see where someone would conclude that he was acting disoriented. And so when you look at the evidence and give us all reasonable inferences, you have a person who's on the ground, his facial expressions convey to the engaging party that he's disoriented. I certainly would question, from my perspective, representing the plaintiff party, whether that was appropriate. But here in this case, Judge, we have a five second cycle, the first one, followed by at most a two second gap, and then immediately again, there's another five second cycle. Then there's only a two second break, and Officer Hoke again deploys for the third time. A five second cycle. What do you say they should have done? Well, considering that Michael was in a separate room away from Rhonda Shook Eye, he was surrounded by three, arguably four walls with a doorway. There were three officers in the room, they should have, if I were to offer my opinion, they should have went hands on with him and attempted to place him in handcuffs. So there was no point at which he submitted to the officer's authority? Well, I would say there's no point on the video where he actively resisted. Well, is there anything in the facts to indicate he was ever not belligerent and intending to get back to the victim? Just so we're clear, our claims are based on what's on the video. So we're certainly not arguing there was any excessive force where they attempted to take him down to the ground or when they were wrestling with him when they were both up. But as far as being on the ground, we're asserting that he was at most passively resistant or non-compliant. Because the only directives given to Michael on the taser video are either get over or roll over. Given the statements that were being made, at what point could the officers conclude he was not a threat, not only to the victim, but to them as well? Well, the fact is, like I said, he was on the ground, he was face up. Unlike before, where he was threatening them verbally, saying I'm going to kill you. Or he was spitting at them, or swinging at them, kicking at them, trying to use the pliers against them. At this point, we're ten, 12 minutes in where he's battling with one officer, then two officers, then three officers. We have to recognize he's fatigued at this point, especially when you give us reasonable inferences. He's laying on the ground. He's disoriented. That's even, again, looking at the record in the light most favorable to us, even Hulk would suggest that. So you have a disoriented subject who's on the ground, who's been battling officers for 10, 12, 15 minutes. He's not kicking anymore. He's not threatening officers anymore. They're not asking him to put your hands behind your back. They're just saying roll over, get over. You can- Isn't the roll over necessary to get the hands behind the back? Because if he's on his back, then he can't be handcuffed behind his back. Perhaps, but also, I guess I would respond by saying if he's such a threat to officers, why aren't they getting on him immediately at that point? I mean, they're- Get on him, you mean? Go hands on with him, grab him, flip him over, handcuff him in the front, do whatever it would take to neutralize the threat they claim he was. As although we would submit that he was not an active threat at that point. So that's how I would respond to that question. I mean, the evidence establishes these officers reasonably believed he was either under the influence of a controlled substance or alcohol or he was a mentally disturbed individual. And even in looking at it reasonably from that perspective, the officer still nonetheless taser after taser after taser, there were deployments. There was 53 seconds worth of deployment within a 3 minute and 15 second period of time. I don't understand that point. You say they reasonably believed he was under the influence of drugs and therefore, nonetheless they tasered him. I mean, often if somebody's under the influence of methamphetamine, for example, that makes the person more belligerent and hard to control. So I don't know what you mean by nonetheless they tasered him. Well, my next comment, my point was going to be taser has instructed these officers who are equipped with X26 tasers. If you are dealing with an emotionally disturbed person and you continue to use it, it may not have any effect. They didn't pay attention to that warning and that instruction. They continued to tase him and they tase him in such a way that there was very little, if any, break for him to actually respond. I mean, at one point, if you watch the video, your honor, you see the taser deployment occurring, the cycle happening, and they're telling him to turn over. I'm not sure how you expect someone that you reasonably believe to be emotionally disturbed to turn over while you're tasing them. When you have an officer who claims, I can't even recall hearing the tasers. Yet we're going to fault Mr. Zubrod because he didn't roll over while he was being tased and instructed to do it simultaneously? We're, so- I thought in the stun mode, the taser didn't incapacitate him, it just caused pain. Nonetheless, delivers 50,000 volts of extreme pain, and that's what you can hear Mr. Zubrod vocalizing while he's being tased. So we believe that it's a fact question as to whether there was sufficient time for Michael to even respond. So summary judgment would have been inappropriate in that respect. But the bottom line is, we don't believe that this was the rapid evolving situation that the court conveyed. It's clearly demarked, just like we had in Kraut, just like we had in Landis. At the time when the tasers occurred, he was non-violent, he was passive, he was simply not complying with the officer's- Counsel, you've just about exhausted your time. I don't know if you want to reserve any or not. I would like to, if I could get just, yeah, the remaining time, your honor. Mr. Bays. May it please the court. Thomas Bays for the defendants in this matter, your honors. Thank you. There's really four topics that I want to make sure I address today. First is the factual background of this situation, which I think informs the court's analysis for certain. The second is the evidentiary issue of the EMT statements that is addressed in the briefs. And then I want to also address the prongs of the qualified immunity test, the objective reasonableness, and the clearly established prongs. First, this was a supremely violent, shockingly violent encounter. Deputy Short was called to this scene by citizens who were screaming from the house. Deputy Short described these screams as the worst screams he's ever heard. He proceeded upstairs, found that the bedroom door was locked. He kicked it in and observed Mr. Zubrod taking a hammer to the face of Ms. Shakay. He instructed him to stop, it appeared that he reacted to it. And at that point, Deputy Short drew his taser. Instead though, Mr. Zubrod reached and grabbed a pair of scissors and stabbed Ms. Shakay in the neck. Deputy Short then deployed his taser, but as is undisputed, that was an unsuccessful deployment. Deputy Short was then forced to go hands-on alone with Mr. Zubrod for as long as eight minutes in a struggle. Thankfully, he was able to extract Mr. Zubrod from the one bedroom into another and away from the victim. But it was obviously an intense encounter, a violent encounter that occurred for a lengthy period of time. Finally, after eight minutes, a second deputy, Deputy Hoke, arrived on the scene. Deputy Hoke indicated in his testimony and reenactment video that he saw Ms. Shakay and immediately called for EMT response to her at that time. He then went on to assist Deputy Short in restraining Mr. Zubrod. Deputy Short, I think, believed, it's hard to know what he believed, but somehow Mr. Zubrod extracted himself from the pen that Deputy Short had him in. And at that point, Deputy Hoke decided to attempt to deploy his taser in the probe dart mode. Again, that was unsuccessful. It appears in that instance, one of the probes hit the belt of Mr. Zubrod, and thus he was not incapacitated. Was there forensic evidence to indicate how many times he actually was tased over the period of this confrontation? Yes, Your Honor, in the medical examiner's report, there was three probes, marks to the body of Mr. Zubrod, and one probe was actually found in the belt of Mr. Zubrod. And there were just two burn marks on Mr. Zubrod's body. So it's certainly clear from that evidence that there was not ten burns in probe mode to Mr. Zubrod at most, there were two. When you say burns in probe mode, that's the stun? In the stun, dry stun mode, yes, Your Honor, the pain compliance mode. So that's what the objective medical evidence shows in this instance. Shows how many? How many deaths? There would have been, it appears to be two successful stuns of him. There's two burn marks on his body, that's all. And we know that none of the probes were successful in this instance until the very end when Mr. Deputy Hoke deployed the, so during the course of the struggle then, Deputy Hoke and Deputy Short were hands on, Deputy Smith also showed up and deployed his taser, but it malfunctioned and never fired. So is that forensic evidence undisputed? Yes. For judgment purposes. There's been no dispute as to the forensic evidence in the record, right. So Officer Smith attempted to deploy, he was unsuccessful, and then Deputy Hoke reloaded and was able to successfully deploy in the dart mode, but those darts entered the thigh of Mr. Zubrod close together and were, did not incapacitate him, and that's undisputed also in the record, that there was no body incapacitation of Mr. Zubrod during the course of the entirety of the struggle. EMT Paulson provides other key evidence in this case by affidavit that's undisputed and uncontradicted that he arrived upstairs, witnessed the deputies struggling with Mr. Zubrod while he had one wrist in a handcuff, which of course is a dangerous situation because that handcuff which is not restrained to the other can be used as a weapon and is dangerous to the officers and as Mr. Brown suggested, a hands on, ongoing hands on struggle, less desirable due to the potential for use of a weapon against the deputies by the suspect. I think the taser video is very helpful in this case for the court's information and I don't believe that it shows, it reflects what the opposing counsel represents. It reflects a suspect who's constantly struggling, fighting, kicking, resisting arrest, non-compliant throughout. Regarding now the evidentiary issue which I want to make sure that I address is the district court declined to accept into evidence and use as a basis for its decision the EMT statements given by four EMTs. These were found inadmissible and rightfully so. Three of the four are unsigned by the EMT. One of those three doesn't even have the name of whoever's making that statement in it and what was included in the record. Pursuant to summary judgment under the life investors case, which we cite in our brief, which has been, was decided in 2012, a following amendment in 2010 to Rule 56, the Eighth Circuit still states that a statement by an individual must be supported by an affidavit and that was not done here. Additionally, in a more recent case, the Banks v. Relying on 28 USC 1746, that an affidavit or declaration must include a statement that it's certified to be true under penalty of perjury. None of that happened here. For that reason, the district court was clearly correct to not consider these statements. And the district court's decision in that regard is reviewed on an abusive discretion, your honor, a standard, your honor, and should be affirmed. Additionally, we posit that those statements are hearsay in a number of instances, double hearsay, hearsay within hearsay. It's plaintiff's burden to show that some exception to hearsay. They failed to do it in the district court. They failed to do it in their opening brief. They've made a light effort at doing so in the reply brief. But no clear analysis or supportive case law is cited to show that those statements are admissible hearsay in this instance. Next, your honor, I want to move to the factors of the qualified immunity test. First, the objective reasonableness portion of the test. The court looks to the severity of the crime, the flight risk, and the safety of the officers and others when weighing the objective reasonableness of the conduct. And it's important not to second guess the officers. Obviously, these are split second decisions in ten situations, which the district court recognized. There's a litany of case law that would support finding that the conduct of the officers in this instance was objectively reasonable. We cite to the Du Bois case where eight taser deployments were made on a victim with six officers around that victim. And this court found that to be objectively reasonable under those circumstances. In the Carpenter case, multiple taser deployments were made on an individual who was a non-violent offender. Later, he had responded to a fight and was a spectator to it. One officer instructed him to stop. He failed to do so. The officer took him down, and he was apparently non-compliant with putting his hands behind his back, which from the video is the same conduct that Mr. Zubrod was engaged in. He was not compliant. He was not putting his hands behind his back. And in Carpenter, the court held that deployment of the taser in a situation like that with a non-compliant suspect is objectively reasonable. Another very recent case, in fact, it was decided following the submission of our briefing in this case, is the Brossert case, Brossert versus Jenke. It is at 859 F3D 616, a 2017 decision by the Eighth Circuit. In that case, a suspect was in handcuffs in the backseat of a police vehicle. And the law enforcement officer instructed him to move over from the seat on the end to the seat in the middle. The officer perceived that the suspect was non-compliant and stunned him with his taser. This court, the Eighth Circuit, found that to be objectively reasonable under the circumstances. A non-compliant suspect, a certain amount of force can be used on that suspect to gain compliance. To hold this case differently would essentially be in direct contravention of that Brossert decision. The case I think that's relied on most by opposing counsel is the Moore case, which is just a district court case from Missouri. It's non-presidential, obviously, here. And in that case, it's undisputed that the suspect was tased with a full body lockup, which is clearly different from the present case. Here we had a violent resisting suspect, bystanders, one who was gravely injured were nearby. There were threats to their safety. And as to the suggestion that the officers just should have gone hands on, they had done that for probably upwards of 12 minutes and been unsuccessful. And it's also undisputed that the parties were bloody and slippery, making a hands-on encounter all the more difficult. Finally, your honors, I want to address the clearly established prong of the qualified immunity test. So there must be specific guidance to law enforcement that something that they are doing is unlawful. In order for them to be found guilty of using excessive force. Here, there's no US Supreme Court case law, no 8th Circuit case law, that says that a taser cannot be applied on a violent non-compliant suspect. And that's just what this case is. He was violent throughout. He was non-compliant throughout. The taser's an appropriate response to that and has always been held so. And there's certainly never been a clearly established decision by this court or the US Supreme Court that such deployment of a taser is unlawful. And again, I would appoint the court to the more recent Brossard versus Janky case. In that case, like I said, the suspect was tased while in handcuffs in the back seat of a police vehicle. The court held, the 8th Circuit held that it was not clearly established that taser deployment in that situation was improper. And there's another case, which is the Buckley case, which was cited by the district court below from the 11th Circuit, where a suspect was tasered three times while in handcuffs. But was non-compliant. And in those instances, the court held that deployment of the taser on such a subject was both objectively reasonable and did not violate any clearly established law. We do also have a cross appeal in this matter. We would like the court to instruct the district court to take up the state law claims. The district court refused to exercise discretion. In the interest of judicial efficiency, as well as making sure that rulings are consistent. In this instance, the state law claims evaporate if the federal law claims do. And we would like an order that the district court also dismiss the state law claims in this matter. I know you'd like it, but what obligation did the district court really have to- Decide state law claims under supplemental jurisdiction, that's the argument? That's right, and in this instance- We ever said that it is an abuse to decline? And here's what I would say, your honor. The case law suggests there's a number of factors that the district court should consider when deciding whether to accept or decline jurisdiction. The district court failed to consider or state that it considered those factors. And if it did, those factors clearly militate towards exercising that discretion in this case. Because it would be economical, efficient, and ensure consistency of rendering of judicial opinions. Would you have any kind of collateral estoppel, or not res judicata, but if it went to state court, would your concern about consistency be handled through doctrines like issue preclusion? We would certainly argue that, whether a court would necessarily accept that, because there are different claims. Obviously, state law claims and federal claims in the state is not necessarily beholden, of course, to federal law. What's the problem with consistency, then, if they're not the same claims? But to this point, the state courts have said that if the federal claims don't exist, that they won't proceed with the state, the state law claims also must fail, so. Because reasonableness is the standard in both? That's right, your honor. So, it's a matter of efficiency. I understand the economy argument, so I was just wondering what real threat there is about inconsistency. And it is, thank you, your honors. Thank you, Mr. Bays. Mr. Brown, I think you have a minute or so left. Thank you, your honor. This court has previously held that the use of a taser is a significant use of force, more so than punching, or kicking, or kneeing, which is a kind of conduct which was sanctioned in the Crout case. Therefore, we would submit that it's clearly established you're not allowed to tase someone gratuitously, repeatedly, if it's not gaining any advantage or benefit. Particularly when the circumstances now suggest you have a non-active resistive suspect or subject like you had in Crout, like we've had in Landis, and like we had in Moore. So we would ask the court to apply the standard that when looking at the tasers and the conduct, if Mr. Zubrod was not violent, not resistive, or not attempting to flee, there's a genuine issue of material fact that should be submitted to a jury, and we'd ask the court to reverse the summary judgment. Thank you. Thank you, Mr. Brown. Court thanks both counsel for the argument you've provided to the court this morning. We'll take the case under advisement to render decision in due course. Thank you.